Jerome WINKLER, Plaintiff,

v.

NRD MINING, LTD., H. Becker–Fluegel, G. Runolfson, J. Michael Wigley and Howard Bronson & Company, Defendants.

No. CV 82–3318(MDG).

United States District Court, E.D. New York.

March 31, 2000.

Edwin J. Mills, Stull, Stull & Brody, New York City, for plaintiff.

Frank Cohen, Farber & Cohen, New York City, James P. Beggans, Jr., Law Offices of James P. Beggans, West Orange, NJ, for Howard Bronson & Company.

Christopher P. Johnson, Daniel J. Thomasch, Fitzpatrick, Cella, Harper & Scinto, New York City, James P. Beggans, Jr., Law Offices of James P. Beggans, Jr., West Orange, NJ, H. Becker–Fluegel, Staten Island, NY, for H. Becker–Fluegel.

## MEMORANDUM DECISION AND ORDER

GO, United States Magistrate Judge.

Defendants Herman Becker–Fluegel ("Becker–Fluegel") and Howard Bronson & Company ("Bronson") move for an order pursuant to Rule 50(b) directing the entry of judgment dismissing the complaint against them as a matter of law, or alternatively for a new trial pursuant to Rule 59. On May 1, 1996, the jury returned a verdict in favor of plaintiff, awarding him damages in the amount of $26,200 and the other class members damages in the amount of $783,000.

For the following reasons, defendants' motion for an order pursuant to Rule 50(b) directing the entry of judgment in their favor dismissing the complaint is granted. For the reasons set forth below, defendants' motion for a new trial is conditionally denied pursuant to Rules 50(c)(1) and 59, in the event that the judgment to be entered pursuant to this decision is subsequently vacated or reversed on appeal.

### A. *Plaintiff's Claims and the Evidence at Trial*

This is a class action brought to recover damages for violations of Section 10(b) of the Securities Exchange Act, 15 U.S.C. 78j, and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. Plaintiff alleges that defendants failed to disclose material information pertaining to defendant NRD Mining, Ltd. ("NRD") in a press release dated April 21, 1981 and in NRD's 1980 annual report distributed to shareholders in June 1981. NRD was a small Canadian mining company listed on the Vancouver Exchange and its stock was traded in the United States on the NASDAQ exchange. It is now essentially defunct.

Defendant Becker–Fluegel was a director and substantial shareholder of NRD in 1980 and 1981, the times relevant to this action. Defendant Bronson is a New York public relations firm, which specializes in distributing financial information about its clients to the financial and investment community. In 1980 and 1981, Bronson was NRD's public relations firm in the United States, pursuant to a monthly retainer arrangement.

The focus of the case concerns an option obtained by NRD in 1981 to acquire a mine in Madawaska, Ontario from Comet Quartz, Ltd. ("Comet Quartz"), another small Canadian mining company. The evidence at trial regarding the allegedly misleading press release and annual report was almost entirely documentary in nature, and thus undisputed in content, although the parties vigorously contested the inferences and conclusions that should be drawn from that evidence.

At trial, the parties agreed that the Madawaska mine contained a deposit of pegmatite, a mineral of which quartz is a major component. The parties also agreed that the Madawaska quartz was of high purity, making it suitable for a variety of commercially valuable uses. The claims arise from a dispute over estimates as to the quantity of high purity quartz in the Madawaska deposit.

In 1980, Comet Quartz, the owner of the Madawaska mine, was interested in selling the mine. It retained Simon Schaffel, a professor of geology at the City College of New York with particular expertise in analyzing pegmatite deposits, to survey the mine and provide a report detailing his conclusions. After an on-site inspection of the mine lasting about 2½ hours and a review of various

materials about the mine provided to him by Comet Quartz, Professor Schaffel prepared a six-page written report dated April 21, 1980 ("Schaffel Rep."). *See* Ex. P–1.[1] Based on his experience, his visual inspection and the available information, Professor Schaffel concluded that the Madawaska mine "is one of the most unusual pegmatite deposits ever found," and "estimate[d] the reserve [of high quality, high purity quartz] at 1,000,000 tons." Schaffel Rep., Ex. P–1 at 6. Professor Schaffel also stated in his report that the one million ton reserve estimate "is on the conservative side." *Id.*

When NRD was negotiating the option agreement with Comet Quartz in 1981, NRD was supplied with a copy of Professor Schaffel's report, along with other materials pertaining to the quantity and quality of the quartz in the Madawaska mine. In March, 1981, NRD issued a press release noting briefly, among other topics, that it was seeking an option to acquire the Madawaska property. *See* Ex. P–3. NRD subsequently entered into an option agreement dated April 10, 1981 with Comet Quartz and other parties. *See* Ex. P–7. On April 21, 1981, NRD issued a press release in the United States discussing the Madawaska option. Exs. P–3, P–4. The release stated, in pertinent part, as follows:

> VANCOUVER, C.B., CANADA, April—J. Michael Wigley, President of NRD MINING LTD., said today that agreement has been reached with the owners of Comet Quartz Ltd. for NRD to acquire the stock of that corporation for $10 million (Canadian) in a combination of cash and royalty payments with the Seller having the right to convert up to $1 Million of that price into NRD Common stock.
>
> Comet Quartz Ltd. owns the rights and permits to a high quality high purity quartz mine located in Madawaska, Ontario, Canada.
>
> A preliminary geological report made available to NRD indicates that on or near the surface the estimated reserved of the mine are in excess of 1 million tons of high

quality and high purity quartz valued at between $500 (U.S.) and $4000 (U.S.) a short ton depending upon purity and usage. This quality quartz is used in electronics, optics, and recently for photovoltaic cells (solar energy) and fiber optics. Preliminary plans call for production levels of approximately 10,000 tons of the quartz in the initial year of operations and to increase that rate to some 50,000 tons per year in the future.

. . .

NRD discussed the subject again in its 1980 annual report mailed to shareholders in June 1981. *See* Ex. P–13. NRD states in a letter to the shareholders at the beginning of the report that:

> Another important step we have taken as a corporation is to obtain an option to acquire the common stock of Comet Quartz ltd., owners of a high purity quartz mine in Ontario, Canada. From reports of a leading University geologist familiar with the mine it is apparent that the deposit is a unique source of high quality quartz compared with material generally found anywhere in the Western hemisphere. He estimates that the quartz reserve on or near the surface exceed 1 million tons with a good possibility of greater tonnages beining available. A program of surface geology and core drilling costing about $100,000 is being conducted by the optioner. . .

*Id.* at first and second pages. The letter is signed by J. Michael Wigley, as President, on behalf of the Board of the Directors. *Id.*

Plaintiff contends that defendants omitted to disclose four critical facts about the Madawaska option in the April 21, 1981 press release and the NRD 1980 annual report. Plaintiff claims that NRD failed to disclose two facts that appear on the face of Professor Schaffel's report. Professor Schaffel wrote:

> The writer rejects the estimate of 1,000,000 pounds [*i.e.*, 500 tons] of quartz as being too conservative. The writer estimates the reserve at 1,000,000 tons. Al-

---

1. References to plaintiff's exhibits admitted into evidence at trial are preceded by "Ex. P-" followed by the exhibit number.

though the reserve, ultimately can only be proven by a complete drilling and mapping program the writer believes that his own estimate (1,000,000 tons) is on the conservative side.

Schaffel Rep., Ex. P–1 at 6. Plaintiff claims that defendants omitted to disclose both the earlier 500 ton estimate and the qualification that Professor Schaffel's contrary and much higher estimate could only be "proven by a complete drilling and mapping program."

Next, plaintiff claims defendants failed to disclose that Professor Schaffel had an alleged conflict of interest because of a financial interest in inflating his estimate of the Madawaska quartz reserve. Plaintiff's contends that if NRD had exercised its option and if the mine had been developed, Professor Schaffel stood to earn additional consulting fees and hoped to have some involvement in the distribution of the quartz, thus earning commissions.

The fourth critical fact which plaintiff claims defendants omitted to disclose was another estimate of the total quartz reserve at Madawaska in the amount of some 19,000 tons. This estimate is referred to in a report dated June 22, 1981 ("Howe Rep.") by A.C.A. Howe International, Ltd. ("ACA Howe"), a Canadian mining consulting firm. *See* Howe Rep., Ex. P–15.

After NRD obtained its option, it retained ACA Howe to perform a limited drilling program in an attempt to verify the existence of the quartz reserves estimated by Professor Schaffel. In its report, ACA Howe discussed the history of the Madawaska mine, noting that:

The Madawaska Feldspar Company Limited acquired the property about 1947. Limited drilling that year, combined with visual estimates outlined 19,080 tons of clean quartz and 3,610 tons of potash feldspar (Mining Research Corporation Limited 27/10/47 report to Madawaska Feldspar Company Limited).

*Id.* at P–15 at 6. Plaintiff claims that this 1947 estimate of only 19,080 tons of "clean quartz" was material to investors in 1981, in that this estimate, like the 500 ton estimate referred to in Professor Schaffel's report,

cast doubt on Professor Schaffel's higher estimate.

At trial, Bronson conceded that it was involved in drafting the April 21 press release and caused it to be disseminated to the Wall Street Journal, the New York Times and the wire services in April, 1981. In a draft press release it prepared, Bronson wrote: "[i]n the interim NRD has the right to investigate and evaluate the property and to do test drilling to determine the quartz reserve." Ex. P–8. Although Bronson regarded the qualification about test drilling to be important, the press release ultimately issued on April 21 omitted the clause Bronson drafted. Bronson also conceded that it had provided "suggestions" to NRD regarding the wording of the "Dear Shareholder" letter at the start of the 1980 NRD annual report.

Bronson also testified that, while he made suggestions to NRD regarding the press release and the annual report, his firm had no authority and no responsibility to dictate the terms of either document. Rather, Bronson characterized his firm's role as that of a "conduit" of financial information. In that role, Bronson claimed to be careful in reviewing press releases or other documents for clear factual errors or serious overstatements or unbalanced presentations, but did not otherwise attempt to control or check the content of its client's public statements.

There was considerable testimony that the rules of the Vancouver Exchange required listed companies to submit proposed press releases to the Exchange for review and approval prior to their issuance. The documentary evidence and Bronson's testimony support the conclusion that the final wording of the press release was determined by J. Michael Wigley, the president of NRD, in NRD's Vancouver office, in consultation with officials of the Vancouver Exchange.

Becker–Fluegel denied any role in the drafting of the April 21, 1981 press release, or the relevant portions of the 1980 annual report. The documentary evidence established clearly that the drafts of the press release passed through Becker–Fluegel's office in New York, and were transmitted between Bronson's New York office and NRD's

Vancouver office using the telex in Becker–Fluegel's office. Bronson testified that, in drafting the press release, he dealt with Wigley, not Becker–Fluegel. Becker–Fluegel signed the financial statements appearing in the 1980 annual report, and is identified on the last page of that report as a Director. He claimed that he had no role in drafting the textual portions of the annual report, and could not recall whether he had seen it before it was mailed to shareholders in early June 1981.

There is no dispute that the April 21, 1981 press release and the 1980 annual report do not disclose (a) the 500 ton estimate referenced by Professor Schaffel; (b) the 19,080 ton estimate derived from a 1947 report, referenced in the ACA Howe report; and (c) any conflict of interest affecting Professor Schaffel's estimate. Nor is there any dispute that the April 21, 1981 press release does not qualify the one million ton estimate with the observation noted in Professor Schaffel's report that the estimate can "only be proven by a complete drilling and mapping program". The 1980 annual report makes reference to a "program of surface geology and core drilling costing about $100,000," (Ex. P–13, p. 4), but plaintiff contends that this disclosure was too little, too late.

In the first three months of 1981, NRD stock traded at prices ranging from $9 to $13 per share. Beginning on April 6, 1981 the stock price rose to $14 per share and reached a high of $15–3/4 on April 16, 1980. Ex. P–36. The price of the stock closed at $15–1/2 on April 21, 1981 and continued, with some minor aberrations, to decline to a price of $6 on September 3, 1981.

## B. *The History of the Case*

This action was commenced in 1982. Defendants NRD, G. Runolfson and J. Michael Wigley were all properly served but defaulted in appearing. Their default was noted on the docket in 1990. After trial, judgment by default was entered against them in the amount of the jury verdict. Only defendants Becker–Fluegel and Bronson defended this case, and appeared at trial.

Since its filing in 1982, this case has had a tortuous history. Since plaintiff relies in part on rulings made earlier in the case, the pertinent motions will be recounted here.

In a brief order dated March 5, 1985, Judge Costantino, the judge originally assigned this case, certified the plaintiff class. The class, as certified, consisted of all persons who purchased common stock of NRD between April 21, 1981, the date of the press release which plaintiff claimed artificially inflated the price of NRD stock, and September 4, 1981, the date by which the material information omitted from NRD's press release and annual report were made public and absorbed by the market.

During the years the case was assigned to Judge Costantino, defendants made three motions for summary judgment, each of which was denied. See *Winkler v. NRD Mining Ltd.,* 1988 WL 16176 (E.D.N.Y.1988). Defendants also moved for a preliminary hearing on the issue of intent, which Judge Costantino denied as well.

After Judge Costantino's death in 1990, the action was reassigned to Judge Sifton. In an opinion dated April 12, 1991, Judge Sifton denied defendant Becker–Fluegel's motion to decertify the class.

After the case was reassigned to Judge Ross, Bronson made another motion to dismiss or for summary judgment. Bronson argued in that motion (as it does again on the motions before me) that plaintiff's claims fail as a matter of law under *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). In an opinion dated June 7, 1995, Judge Ross denied the motion, finding that *Central Bank* did not preclude a finding in favor of plaintiff "provided that all the requirements for primary liability are met."

In 1995, defendants also moved before Judge Ross for an *in limine* ruling pursuant to Fed R. Evid. 702 to exclude the testimony of plaintiff's expert, James C. Hammerslough. Defendants did not contest Mr. Hammerslough's qualifications, but instead challenged the reliability of his methodology and proposed testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

Judge Ross referred that motion to Magistrate Judge Gold to report and recommend a decision. On May 12, 1995, Judge Ross also entered an order referring this case to a visiting judge for trial and to consider any objections to the report to be issued by Magistrate Judge.

After conducting a hearing on the *Daubert* issue, Judge Gold issued a report and recommendation dated June 29, 1995 ("Rep. & Rec.") recommending that defendants' motion to exclude the testimony of plaintiff's expert be denied. As Judge Gold noted, "the thrust of defendant's challenge is based on the fact that the price of the stock decreased rather than increased after the press release at issue." Rep. & Rec. at 5. Magistrate Judge Gold rejected that defendants' argument that the decline in the stock price after the issuance of the April 21, 1981 press release rendered Hammerslough's conclusions illogical. *Id.* He found that Hammerslough's contention that the omissions in the press release artificially inflated NRD's stock price could, if supported by the evidence at trial, be reconciled with the fact that the price of NRD's stock dropped rather than increased following that press release under Hammerlough's theory of "selling on the news." *Id.* Judge Gold also noted that "[n]o contrary expert testimony was presented by defendants," and that there was some evidence "which indicates that the news of NRD's acquisition of an interest in a rich quartz mine was disseminated prior to the beginning of the class period." *Id.* at 5–6.

Defendants now make essentially the same arguments on this motion, contending that the premises of Hammerslough's theory were clearly disproven by the evidence at trial.

Defendants filed objections to Judge Gold's report and recommendation on July 10, 1995, and plaintiff filed its response on July 20, 1995. In mid-July 1995, the case was assigned for trial to Judge Manuel Real, visiting from the Central District of California. At a series of conferences in late July and early August 1995, Judge Real inquired about plaintiff's compliance with the notice requirements in Judge Costantino's 1985 order certifying the class that certain mailings be made to class members within a specified time period.

On August 2, 1995, when the case was before him for trial, Judge Real entered an oral order decertifying the class, finding that plaintiff was responsible for a four-year delay in providing the required notice to class members. Defendants had not made any motion seeking that relief before Judge Real. In so ruling, Judge Real rejected plaintiff's contention that there was no such four-year delay, and that in all events, the issue had been fully addressed by Judge Sifton in the 1991 decision.

At the same time, Judge Real granted defendants' application for a *voir dire* of plaintiff's expert, Mr. Hammerslough. At the conclusion of that hearing, Judge Real ruled that Hammerslough would be permitted to testify as an expert only concerning the valuation of securities but not as to causation. Judge Real did not rule specifically on the objections to Judge Gold's report, although the effect of his ruling on Hammerslough's was to accept in part and reject in part Judge Gold's recommendation.

On August 9, 1995 when the parties appeared for trial, Judge Real informed them that he would be unable to try the case, and referred them to Judge Wolle, a visiting judge from the Southern District of Iowa, for trial. When the parties reported to Judge Wolle for trial on August 9, 1995, Judge Wolle was engaged in another jury trial and advised that he would not be able to try this case. At Judge Wolle's suggestion, the parties reported these developments to Judge Ross, and the plans to try this case before a visiting judge in the summer of 1995 ended.

On November 27, 1995, plaintiff moved to vacate Judge Real's order decertifying the class and excluding in part Hammerslough's testimony. The parties eventually consented to a trial before a magistrate judge, pursuant to 28 U.S.C. § 636(c), and the case was reassigned from Judge Ross to me for trial.

On March 22, 1996, I held a hearing on plaintiff's motion to vacate Judge Real's order decertifying the class. Judge Real apparently had decertified the class because he found an aspect of Hammerslough's intended

testimony—that relied on a "sell on the news" theory to explain the downward movement in NRD's stock, while, at the same time, claiming that defendant's material omissions from the press release inflated price of the stock—to be inherently particularized as to each class member and thus inconsistent with class treatment. Judge Real did not explain the reasons for his conclusion, and I could not see how plaintiff's theory was inherently inconsistent with class treatment. After oral argument, I granted plaintiff's motion to vacate Judge Real's decertification order, finding no change in circumstances between the time of Judge Sifton's ruling in 1991 to the time of Judge Real's *sua sponte* order in 1995, warranting reconsideration of Judge Sifton's denial of defendants' motion to decertify the class.

I also found no reason to reject Judge Gold's recommendation that defendants' motion seeking to exclude Hammerslough's testimony should be denied in its entirety, or why Hammerslough should be precluded from testifying on causation issues, but not valuation. Judge Real's oral ruling did not state any reasons for his contrary conclusion, and I could find none.

A jury trial was held in April, 1996 and lasted four days. Plaintiff Winkler testified and also called as witnesses Professor Simon Schaffel, Howard Bronson (the president and sole shareholder of defendant Bronson), Becker–Fluegel, William Bernard Macisaac (a geologist, and the author of the ACA Howe report), Gerald William Felderhof (another geologist, and the president of ACA Howe), and James C. Hammerslough. At the conclusion of plaintiff's case, defendants moved for entry of judgment as matter of law, pursuant to Rule 50(a). Tr. 4/25/96 at 372–96. I reserved decision on the motion. Tr. 4/25/96 at 396.

On their case, defendants called John R. Bogert (another geologist and a former director and president of NRD), J. Mark Penny (defendants' expert on damages and causation), Robert D. Reese (a mining company executive), and Becker–Fluegel.

Following three days of deliberations, the jury returned a verdict on May 1, 1996, against defendants Becker–Fluegel and Bronson, awarding plaintiff-class representative Winkler $26,200 in damages and the other class members $783,800 in damages.

Following the jury's verdict, defendants timely renewed their motion for judgment as a matter of law pursuant to Rule 50, and as permitted by the rules, combined it with a motion in the alternative for a new trial pursuant to Rules 50(b) and 59.

## *DISCUSSION*

### I. THE MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO RULE 50

A court considering a motion for judgment as a matter of law "must view the evidence in the light most favorable to the party against which the motion is made." *Piesco v. Koch,* 12 F.3d 332, 342 (2d Cir. 1993). A court should grant a Rule 50 motion "only if it can conclude that, with credibility assessments made against the moving party and all inferences drawn against the moving party, a reasonable juror would have been compelled to accept the view of the moving party." *Piesco,* 12 F.3d at 342. *See Samuels v. Air Transport Local 504,* 992 F.2d 12, 14 (2d Cir.1993) (Rule 50 motion should be denied unless "there can be but one conclusion as to the verdict that reasonable men could have reached"); *Metromedia Co. v. Fugazy,* 983 F.2d 350, 361 (2d Cir. 1992), *cert. denied,* 508 U.S. 952, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993) (same).

### A. *Primary Liability under Central Bank*

Becker–Fluegel and Bronson both contend that they are entitled to judgment as a matter of law since plaintiff failed to prove the required elements of primary liability required by *Central Bank.* When this motion was made in 1996, there was considerable doubt about the standards to be applied in distinguishing "primary" violations from the type of "secondary" activities which the Supreme Court rejected as a basis for Section 10(b) liability in *Central Bank.* The Second Circuit has recently clarified the law governing this issue in this Circuit, and in so doing, has explicitly rejected the authorities on

which plaintiff relied in support of its position on this motion.

In *Wright v. Ernst & Young LLP*, 152 F.3d 169, 174–76 (2d Cir.1998), the Second Circuit discussed at length the two lines of cases that developed in the lower courts following *Central Bank*. In the first line of cases, typified by *In re Software Toolworks*, 50 F.3d 615 (9th Cir.1994), and *In re ZZZZ Best Securities Litigation*, 864 F.Supp. 960 (C.D.Cal.1994), the courts adopted a "substantial participation" test, under which "third parties may be primarily liable for statements made by others in which the defendant had significant participation." *Wright*, 152 F.3d at 175 (quoting *In re MTC Electronic Technologies Shareholders Litigation*, 898 F.Supp. 974, 986 (E.D.N.Y.1995)).

Throughout this case, plaintiff has relied on *Software Toolworks* and *ZZZZ Best*, and has sought to distinguish the cases declining to follow the "substantial participation" test, such as *In re MTC Electronic Technologies Shareholders Litigation*, 898 F.Supp. 974 (E.D.N.Y.1995). *See* Plaintiff's Memo in Opposition, at 2–3 and n. 1. In a post-argument letter dated February 26, 1998, plaintiff also cited *Klein v. Boyd*, 1998 WL 55245, 1998 U.S.App. Lexis 2004 (3d Cir.1998), where the Court concluded that *"Software Toolworks and ZZZZ Best* faithfully adhere to *Central Bank of Denver." Id.* at *38, n. 7. In March 1998, however, the Third Circuit vacated its decision and granted a rehearing *en banc Klein v. Boyd*, 1998 WL 55245 (3rd Cir. March 9, 1998). A decision has yet to be issued.

In the second line of cases, the courts applied a "bright line" test, holding that "a third party's review and approval of documents containing fraudulent statements is not actionable under Section 10(b) because one must make the material misstatements or omission in order to be a primary violator." *Wright*, 152 F.3d at 175. In *In re MTC Electronic Technologies Shareholders Litigation*, 898 F.Supp. 974 (E.D.N.Y.1995), Judge Gleeson concluded that *Central Bank* required the application of the "bright line" test, and rejection of the "substantial participation" test.

In *Wright*, the Second Circuit adopted the "bright line" test, expressly noting that it declined to follow the "substantial participation" test of *Software Toolworks* and other decisions. *Id.*, 152 F.3d at 175–76. The *Wright* court also considered and rejected the argument that its decision in *SEC v. First Jersey Securities*, 101 F.3d 1450 (2d Cir.1996), *cert. denied*, 522 U.S. 812, 118 S.Ct. 57, 139 L.Ed.2d 21 (1997), adopted the "substantial participation" test, at least in certain circumstances. In *First Jersey Securities*, the Second Circuit had said that "[p]rimary liability may be imposed 'not only on persons who made fraudulent misrepresentations but also on those who had knowledge of the fraud and assisted in its perpetration.'" *Id.*, 101 F.3d at 1471 (quoting *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 517 (2d Cir.1994)).

Explaining that language in *First Jersey Securities*, the Second Circuit wrote in *Wright*:

> In *First Jersey*, we affirmed the imposition of primary liability under § 10(b) on Robert Brennan, the president, chief executive and sole owner of First Jersey Securities, Inc. Brennan had directed his employees to make false and misleading statements to customers. We held Brennan liable for securities fraud in his capacity as a "controlling person," that is, for fraud planned and directed by upper level management. *Id.* at 1471–74. Here, we confront alleged fraud by accountants—secondary actors who may no longer be held primarily liable under § 10(b) for mere knowledge and assistance in the fraud.

*Id.*, 152 F.3d at 176:

In applying the "bright line" test, the *Wright* court noted that the Second Circuit had already made it clear that a plaintiff must prove that a defendant personally made a materially false statement or intentionally omitted to disclose a material fact, in order to support the imposition of liability under § 10(b). Quoting its earlier decision in *Shapiro v. Cantor*, 123 F.3d 717 (2d Cir.1997), the *Wright* court noted:

> In *Shapiro*, we followed the "bright line" test after observing that "'[i]f *Central Bank* is to have any real meaning, a defen-

dant must actually make a false and misleading statement in order to be held liable under Section 10(b). Anything short of such conduct is merely aiding and abetting, and no matter how substantial that aid may be, it is not enough to trigger liability under Section 10(b).' "

152 F.3d at 175 (citations omitted).

■ This standard is both clear and demanding, and has not been met in this case. The omissions about which plaintiff complains relate to two documents, a press release and an annual report. The point of the "bright line" test is to rule out, as a matter of law, liability under Section 10(b) based on inferences drawn from the degree of a defendant's participation in the preparation of any given statement alleged to be misleading. Instead, the "bright line" test requires proof that the allegedly misleading statement was made by and attributed at the time of its issuance to the defendant being sued. As the Second Circuit made clear in *Wright* and *Shapiro*, "a secondary actor cannot incur primary liability under the Act for a statement not attributed to that actor at the time of dissemination" because "[r]eliance on representations made by others cannot itself form the basis of liability." *Wright*, 152 F.3d at 175. Since the focus of the inquiry is the contents of the allegedly misleading statement itself, and in particular the identity of the person or entity to whom the statement is attributed at the time of its dissemination, this issue is appropriate for resolution under Rule 50.

Here, nothing in the April 21, 1981 press release is attributed to either Becker–Fluegel or Bronson as their statement. To the contrary, the press release begins by stating that "J. Michael Wigley, President of NRD Mining Ltd., said today . . ." Ex. P–3. The press release received by plaintiff was on NRD stationery and was accompanied by a cover letter from Wigley, as President of NRD, dated April 23, 1981, stating: "Dear Shareholder: I thought you would be interested in receiving the enclosed news release. This property could be of significant importance to the future of the Company." Ex. P–4. Becker–Fluegel is not mentioned in the press release at all.

■ With respect to NRD's 1980 annual report, Becker–Fluegel signed the consolidated balance sheet, although his signature as it appears in the annual report is indecipherable. *See* Ex. P–13 at 4. Becker–Fluegel testified that his signature was affixed only to "the financial statements which are required in Canada to be signed by two directors." Tr. 4/24/96 at 221. His name also appears on the last page of the annual report where he is identified as a director.

The omissions about which plaintiff complains do not pertain to the financial statements, but rather to the "Dear shareholder" letter dated May 20, 1981, signed only by Wigley as president of NRD with which the annual report opens, and in the general discussion of NRD's operations and prospects immediately following Wigley's letter. Becker–Fluegel is not mentioned in either the "Dear shareholder" letter or in the general discussion of NRD. Nothing in those portions of the annual report is attributed to him as his statement. Nor is any statement about NRD's prospects or plans in general, or the Madawaska mine in particular, ever attributed to Becker–Fluegel personally in any document in evidence. Since NRD only acquired its option in 1981, and the financial statements signed by Becker–Fluegel as "approved by the Board" were for the year ended December 31, 1980, nothing in them had anything to do with NRD's option on the Madawaska mine. Thus, nothing in the annual report relevant to plaintiff's claims in this case is attributed to Becker–Fluegel, either directly or indirectly, as his statement.

Moreover, plaintiff never testified that he relied on any statement by Becker–Fluegel, or ever regarded Becker–Fluegel as the maker of any statement in either the press release or the annual report. Nor did plaintiff claim that Becker–Fluegel ever made any statement to the market in general about the Madawaska mine upon which he constructively relied on a "fraud on the market" theory.

■ Plaintiff contended that Becker–Fluegel actually *made* the statements containing material omissions. In support of this argument, plaintiff points to evidence that Beck-

er–Fluegel received drafts of telexes from the NRD office in Canada, transmitted the telexes to Bronson and discussed at least three drafts of the press release with Bronson. *See* Plaintiff's Memo in Opposition at 3–5. As plaintiff also notes, some of the qualifying language discussed between Becker–Fluegel and Bronson did not appear in the final press release. *Id.* at 4–5. While such evidence, along with what plaintiff characterized as evasiveness on the part of Becker–Fluegel, could lead a reasonable juror find that Becker–Fluegel was substantially involved in the preparation of the press release, such involvement fails the "bright line" test under *Wright* and *Shapiro* that the statements containing material omissions be attributable to Becker–Fluegel.

■  The only other basis for imposing liability upon Becker–Fluegel is as a "controlling person" within the meaning of *First Jersey Securities*. Whether plaintiff could have established "controlling person" liability against Becker–Fluegel is not an issue at this point, since plaintiff did not pursue it at trial by requesting a charge to the jury or otherwise pursuing such a theory. Proof of "controlling person" liability requires a plaintiff to show "a primary violation by the controlled person and control of the primary violator by the targeted defendant", along with proof that "the controlling person was 'in some meaningful sense [a] culpable participant[ ] in the fraud perpetrated by [the] controlled person[ ].' " *First Jersey Securities*, 101 F.3d at 1472 (quoting *Gordon v. Burr*, 506 F.2d 1080, 1085 (2d Cir.1974) (bracketed material in original)).

■  Becker–Fluegel testified that he was not involved in the day-to-day management of NRD and had no control over the contents of the annual report or NRD's press releases. According to Becker–Fluegel, NRD's press releases and its other public statement had to be reviewed and approved by the Vancouver Exchange, and all of that activity was handled by Wigley, NRD's president, from NRD's main office in Vancouver. Even though, as plaintiff notes, the evidence suffices to support a finding that Becker–Fluegel had greater involvement than he was willing to admit in the wording of the press

release issued by NRD in the United States, such involvement falls short of proof that he was a "controlling person" in the upper level management of NRD. On the contrary, the fact that the drilling qualification discussed between Becker–Fluegel and Bronson suggests that neither had any degree of control over the contents of the press release.

■  There is no reference at all to Bronson in the 1980 NRD annual report. The only reference to Bronson in the press release is at the top of the document, where Bronson's corporate name and address appear, indicating only that Bronson is the public relations firm disseminating the press release. Yet Bronson's name appears only on the version of the press release disseminated through its office; the copy of the same press release mailed by NRD to its shareholders is printed on NRD stationery and contains no mention of Bronson anywhere on the document. *Compare* Ex. P–3 with Ex. P–4. Even in the version bearing Bronson's name (Ex. P–3), none of the statements in the press release are attributed to Bronson. As the first line of the press release makes clear, the press release is the statement of Wigley in his capacity as president of NRD.

Nor did plaintiff offer any evidence that anyone, including himself, ever understood the press release or the annual report to constitute a statement by either Bronson or Becker–Fluegel, as opposed to NRD and its president, Wigley. Plaintiff testified that he regarded the press release as significant because it came "directly" from NRD. In describing why he brought this suit, Mr. Winkler explained:

> I felt that when I was sent the news release from the company I could rely on that news release being that it came directly from the company, that it would be factual and accurate, and I made an investment based upon that release, which I later found out omitted certain important fact and was inaccurate.

Tr. 4/23/96 at 26.

Plaintiff's damages and causation expert, Mr. Hammerslough, testified to the same effect. Hammerslough testified that he

**366**

"look[ed] at what the NRD Company was saying in its public statements" because "it was the kind of information that was important to investors." Tr. 4/24/96 at 320. When asked to explain what statements by NRD Company he was referring to, Hammerslough specifically identified the April 21, 1981 press release. *Id.* at 320–1.

Consistent with plaintiff's testimony explaining the importance he placed on NRD as the source of the information in the press release, Hammerslough testified that information coming from NRD itself is particularly important to investors and the marketplace in general:

> Always the best information about the company is the company itself. Anything that the company has to say, whether it be in a press release, a speech, in a publicly filed document, almost [any] way you can get it from the company is going to be the best place. If you get it elsewhere you really want to verify it with the company.

Tr. 4/24/96 at 296.

No one testified that either plaintiff in particular or the marketplace in general placed any reliance on representations or statements by Bronson or Becker–Fluegel on any subject. Nor is there any evidence that either plaintiff or the marketplace had ever even heard any representations by Bronson or Becker–Fluegel about the quantity of quartz in the Madawaska mine or anything else of relevance to this case. In addition, there was not evidence that plaintiff or the marketplace regarded the press release as significant or reliable because it was released by NRD in the United States through Bronson as its press agent, rather than in some other manner.

The fact that both plaintiff and Hammerslough placed particular importance on NRD as the source of the information in the press release is of considerable significance in applying the "bright line" test of *Wright* and *Shapiro*. In *Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin,* 135 F.3d 837, 841 (2d Cir.1998), the Second Circuit held that *Central Bank* precluded a finding of liability for Section 10(b) violations based on a claim that a third party conspired with

the primary violators. In explaining the rationale for its ruling, the Court wrote:

> The Supreme Court's analysis [in *Central Bank* ] with respect to the one requirement for primary liability highlighted by the Court—the reliance requirement—constrains our decision here as well. Just as an aiding and abetting cause of action would have impermissibly permitted liability to be imposed in the absence of any showing of reliance, see [*Central Bank* ] at [511 U.S.] at 178–82, 114 S.Ct. at 1449–50, a conspiracy cause of action would similarly render irrelevant the question whether plaintiffs relied on any misstatements or omissions by the defendant being sued. The instant case provides an apt example: the only misstatements or omissions alleged to have been made by Squadron Ellenoff were made to the 1986 Noteholders and the SEC, and plaintiffs—far from relying upon these communications in purchasing their securities—were entirely unaware of them.

*Id.,* 135 F.3d at 843.

In this case, imposing Section 10(b) liability on Bronson because it disseminated NRD's press release in its role as NRD's public relations firm, or on Becker–Fluegel because he signed an otherwise irrelevant section of the annual report and is listed therein as a director, would also contradict the reasoning and logic of *Central Bank,* and would effectively eliminate the requirement that plaintiff prove his reliance on an omission or misrepresentation attributable at the time of its dissemination to the defendant being sued.

In concluding that defendants are entitled to judgment pursuant to Rule 50 on this basis, I am according plaintiff all of the "credibility assessments" and drawing in his favor all of the reasonable inferences permitted by the evidence at trial. In determining whether *Central Bank, Wright* and *Shapiro* entitle defendants to judgment as a matter of law, the critical evidence is the press release and the annual report. The key testimonial evidence came from plaintiff and Hammerslough where they explained that the press release and annual report were of substantial significance because those statements came

directly from NRD. That testimony, moreover, is entirely consistent with Bronson's testimony that his firm was merely a conduit for the release of statements by NRD. In short, the most that plaintiff may have proved is that Bronson and Becker–Fluegel participated substantially in the issuance of statements by NRD and Wigley which omitted facts about NRD's Madawaska option deemed material by plaintiff. That is not enough to sustain the jury's verdict of liability under Section 10(b). *Wright,* 152 F.3d at 175.

## B.  Loss causation

■■■  The Second Circuit requires that a plaintiff asserting a claim under Section 10(b) to establish "both loss causation—that the misrepresentations or omission caused the economic harm—and transaction causation—that the violations in question caused the plaintiff to engage in the transaction in question." *Citibank, N.A. v. K–H Corp.,* 968 F.2d 1489, 1494 (2d Cir.1992) (quoting *Bennett v. United States Trust Co. of New York,* 770 F.2d 308, 313 (2d Cir.1985), *cert. denied,* 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986)). "Whether loss causation has been [established] turns upon a question of proximate cause: was the damage complained of a foreseeable result of the plaintiff's reliance on the fraudulent misrepresentation?" *Weiss v. Wittcoff,* 966 F.2d 109, 111 (2d Cir. 1992).

As the Second Circuit observed in *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763 (2d Cir.1994), a plaintiff alleging fraud must prove "a direct relationship between the plaintiff's injury and the defendant's injurious conduct." *Id.* at 769 (quoting *Standardbred Owners Ass'n v. Roosevelt Raceway Assocs., L.P.,* 985 F.2d 102, 104 (2d Cir.1993)). The Court further explained:

> The purpose of the proximate cause requirement is to fix a legal limit on a person's responsibility, even for wrongful acts. Central to the notion of proximate cause is the idea that a person is not liable to all those who may have been injured by his conduct, but only to those with respect to whom his acts were "a substantial factor in the sequence of responsible causation," and

> whose injury was "reasonably foreseeable or anticipated as a natural consequence."
> ... Many considerations enter into the proximate cause inquiry including "the foreseeability of the particular injury, the intervention of other independent causes, and the factual directness of the causal connection."

*Id.* at 769 (internal citations omitted).

■■■  In the context of securities fraud cases, a plaintiff thus must "show that the misstatements were the reason the transaction turned out to be a losing one." *AUSA Life Insurance Company v. Ernst and Young,* 206 F.3d 202 at 215 (2d Cir.2000) (quoting *First Nationwide Bank,* 27 F.3d at 769). Thus, a showing of a purchase of a stock as a result of fraud may not suffice to prove loss causation, even if plaintiffs would not have been in the market or would have made a different investment but for the fraud. *Moore v. PaineWebber, Inc.,* 189 F.3d 165, 177 (2d Cir.1999).

■■■  Plaintiff's theory of loss causation and damages was that the price of NRD stock was inflated by the material omissions in the press release and, to a lesser extent, by the omissions in the annual report. Plaintiff sought to recover the amount by which the price of the stock was artificially inflated over its market value unaffected by the material omissions. Magistrate Judge Gold held that "[t]his method [of determining damages] is logically consistent with, if not compelled by, the well-settled principle[s]" governing securities fraud actions in this Circuit. Rep. & Rec. at p. 7. I agree.

The issue remains whether plaintiff offered sufficient evidence at trial such that a reasonable juror could find that plaintiff had established loss causation and damages. Plaintiff Winkler testified that he purchased NRD stock based on his understanding of the press release and the annual report. At most, that testimony established transaction causation.

Plaintiff's proof of loss causation and damages consisted of the testimony of Hammerslough. Hammerslough testified that the release of NRD's press release on April 21, 1981 caused the price of the stock to be

artificially inflated over its real value, because if the Madawaska deal had worked for NRD, "[t]he company is going to make a lot of money." Tr. 4/24/96 at 321.

Hammerslough concluded that the critical information omitted from the April press release and the annual report was finally provided to the market in NRD's semi-annual report released at the end of August, 1981. *See* Ex. P–20. He also opined that the market had absorbed the now accurate information about the Madawaska mine option by September 4, 1981. Tr. 4/24/96 at 323.

Hammerslough also attempted to correct for the effect of any market-wide factors impacting on the price of Canadian mining stocks during the class period by using an index derived from the Toronto Exchange of the Canadian mining companies listed there, to normalize his results. Tr. 4/24/96 at 319–20, 324–5. Defendants' expert, Mr. Penny, agreed that this was appropriate.

Based on that analysis, Hammerslough concluded that the true value of NRD stock in mid-April, immediately prior to the April 21 press release, was $6. To the extent plaintiff or any class members paid more than that, Mr. Hammerslough concluded that they had been damaged by the amount that the purchase price paid by them exceeded $6. Tr. 4/24/96 at 316.

The issue on this motion is whether there is sufficient evidence connecting Hammerslough's theory to historical reality for a reasonable jury to base a determination of liability and damages on it, or whether, as defendants maintain, the facts are so inconsistent with Hammerslough's theory as to rule it out as an acceptable basis for a finding of loss causation and damages. The closing bid and asked quotations for NRD stock on the NASDAQ exchange for most of 1981 were received in evidence, *see* Ex. P–36, as well the daily volume of trading in the stock. NRD stock traded in a range of approximately $9 to $11 in January, $9 to $13 in February, and $11 to $13 in March, 1981. NRD stock began April 1981 trading in the range of $11 to $13. On April 9, 1981, NRD announced a deal whereby it would acquire Keystone

Resources, and its stock immediately rose to a high of $15 on April 10.

The stock remained above $15 during the next week, and then on April 22 dropped to about $12 per share. The stock continued to drop, more or less steadily if slowly, through May to a level of about $10 per share. The stock continued to decline in June, ending the month at about $8 per share. For most of July and August, 1981, NRD stock traded in the range of $7 to $8 per share, and bottomed out between $5 and $6 per share in early September. Later in September, the stock rose slightly and was trading in the $7 to $8 range.

The trading volume report indicates that significantly larger amounts of stock began trading in early April, when it spiked to its peak value. While the normal daily volume of NRD stock traded over NASDAQ in the first three months of 1981 varied from about 90 to 150 units (presumably round lots of 100 shares) daily, the trading volume in early April reached 500 units on a daily basis. *See* Ex. P–36. The trading volume on the Vancouver Exchange for the month of April was more than twice that in May and June, and more than five times the volume in July 1981. Ex. P–37.

There was considerable testimony at trial about the reasons for these movements in NRD's stock price. Defendants argued forcefully that the rise in NRD's stock price and the peak in its trading volume, both occurring immediately upon the April 9 announcement of the Keystone deal, were the direct result of that announcement. Keystone Resources was a private company that "over the past seven years [prior to 1981] had average revenues of $90 million and pretax profits of $2 million to $6 million in a single year ... [and] currently has about $17.5 million in assets and $2.5 million in working capital." Ex. P–13 at 3. NRD proposed to acquire Keystone for "approximately $6 million in cash plus some future considerations to be paid depending on Keystone's future earnings." *Id.* In contrast to Keystone, in 1980 NRD had annual revenue of only some $45,000, and a loss on operations of $35,000. Ex. P–13 at 6.

From a financial point of view, NRD's planned acquisition of Keystone was a case of the minnow swallowing the whale, and as became clear at trial, the deal made sense from Keystone's perspective largely for tax reasons. Tr. 4/25/96 at 480, 511–12. Given those facts, none of which was contested at trial, it would have been surprising if the stock of NRD had not spiked upon the announcement of the Keystone acquisition.

Hammerslough testified that he had not taken the Keystone announcement into account in his analysis because he viewed the announcement of the option on the Madawaska mine to be "such an overwhelming announcement, involved so much money, [that the] announcement of an acquisition of a company like Keystone which is certainly not a bad company was just simply not as important." Tr. 4/24/96 at 359. Hammerslough admitted that he was referring only to the potential impact of the Madawaska option on NRD's gross revenue, not its potential earnings from operations, because the April 21 press release provided no basis on which to estimate the cost of developing the Madawaska mine or distributing the quartz once it was mined.

Although Hammerslough said that, in making his analysis, he had not considered the Keystone announcement, or indeed any developments affecting NRD's stock prior to April 21, on cross-examination he was asked specifically whether the Keystone announcement on April 9 caused the rise in NRD's stock to a peak price over $15 on April 10. Hammerslough answered: "I would certainly think it would be not unfair to assume it, Mr. Beggans." Tr. 4/24/96 at 360.

Since the indisputable evidence was that NRD's stock did not show a similar spike in price or volume following the announcement of the Madawaska option on April 21, but in fact started a steady decline, Hammerslough was questioned on how he could maintain that the April 21 press release had caused the price to be inflated. He testified:

Q Let me ask you, Mr. Hammerslough, if the April 21st press release was interpreted by the general investing public the way you've interpreted it, why didn't the price of the stock go up regardless of whether people were selling on the news?

A I do not know that. Possibly because all the buyers have been exhausted. Perhaps—I cannot tell you that.

Q You don't have an answer?

A I don't have an answer as to why it was not immediately, as immediately apparent to the rest of the world as it was to me that this was a terrific thing that was going on.

Tr. 4/24/96 at 360.

When asked to explain the decline in the price of NRD stock from late April through mid-June, Hammerslough responded:

Q What caused the decline in price, Mr. Hammerslough, between April 20th and, let us say, mid June if, in fact, the Howe report became available later in the market?

A On June 17th we're talking an $11 stock here, 11 or $12 stock. Perhaps it was the phenomenon we talked about of selling on the news.

Q What's that phenomenon, Mr. Hammerslough?

A I think it's more fully talked about, the phenomenon is that when people have inside information or what they perceive to be inside information about a security, they buy the security. When the information enters the marketplace those who realize they had inside information, who realize the information was there before then go and sell it, cause a decline, their selling causes a decline, depresses the stock.

Tr. 4/24/96 at 356.

The theory of "selling on the news" had originally been plaintiff's explanation for the run-up in the price of the stock in April 1981 before Hammerslough was asked to consider the impact of the Keystone announcement. When plaintiff first presented this theory to Judge Gold in 1995, no evidence about the Keystone announcement or its market impact was offered or considered, nor was there any evidence about the history of NRD's stock price and trading volume.

At trial, however, Hammerslough himself destroyed the factual premise for plaintiff's reliance on the "sell on the news" theory in this case, when he admitted that the Keystone announcement was the likely explanation for the run-up in NRD's price in April 1981. Moreover, once the spike in the price of NRD's stock on April 10th and the days immediately following it was attributed to the Keystone announcement as its most likely cause, the "sell on the news" theory had nothing to contribute to this case. The price "inflation" that was supposed to have been caused in mid-April by the leaking of the news about the Madawaska option was now being attributed to the Keystone announcement even by Hammerslough. Yet that was the basis on which plaintiff tried to reconcile its claim that the April press release had inflated the price of NRD stock, with the indisputable historical fact that NRD stock did not "inflate" following that press release but rather declined.

Quite apart from Hammerslough's admission, there was substantial evidence at trial establishing that the Keystone announcement was of major significance to NRD and the value of its stock. Mr. Reese, for example, explained that the Keystone acquisition meant substantial "instant earnings" to NRD: "We would be talking $26 million over a short period of time, perhaps a year or two, instant earnings, instant equity." Tr. 4/25/96 at 480. Reese had been employed by Keystone in 1981 when the deal with NRD was under discussion, and was personally familiar not only with Keystone's financial status but also the complex tax reasons why the proposed deal (which never closed) made sense at the time for both NRD and Keystone. Tr. 4/25/96 at 479–80.

Defendant's expert, Mr. Penny, testified that the most glaring deficiency in Hammerslough's analysis was his failure to consider other developments, such as the Keystone announcement, as the real cause of the rise in NRD's stock price in the weeks prior to April 21. Tr. 4/25/96 at 450–57. While Hammerslough did not consider the Keystone announcement prior to trial, at trial he admitted that it was the most likely explanation for the rise in the price of NRD's stock in early April, thus effectively conceding the point Penny was making in his testimony.

Apart from these deficiencies, there was no proof that there had ever been any significant buying of NRD stock from anyone who had learned of the Madawaska option from April 10, when it was signed, until April 21, when it was announced in the press release. At trial, plaintiff pointed to a series of meetings that NRD had arranged with various investment banking firms in New York during April, where NRD was seeking to raise investment capital to proceed with its expansion plans. Tr. 4/23/96 at 100–6, 160–1. Among the investments firms contacted at that time were Lehman Brothers and Fahnestock. *Id.* At those meetings, NRD arranged for Professor Schaffel to make a presentation about his findings regarding the Madawaska mine, as well as his views as to the commercial value of that deposit. Yet there was nothing to indicate that anyone ever purchased a single share of NRD stock as a result of any of those meetings. Tr. 4/24/96 at 357–59.

Plaintiff responds that it is entitled to an inference that such trading occurred, since it is difficult at best ever to develop direct evidence of trading in advance of a corporate announcement. No doubt, plaintiff is correct that direct evidence of insider trading is difficult to obtain. If there were no other plausible explanation for the rise in NRD's stock immediately prior to the April 21 press release, plaintiff would be entitled to the inference it demands. Here, not only is there a highly plausible explanation, but at trial, plaintiff's own expert agreed with it. Whether an inference is reasonable necessarily depends on all of the known facts bearing on the particular issue. On this record, those facts point decisively against the inference plaintiff demands, rendering it clearly unreasonable and speculative at best as an explanation for the movement of NRD's stock price in April 1981.

Hammerslough's acceptance of the Keystone announcement as the most likely explanation for the rise in NRD's stock price in early April also rendered insupportable his conclusion that the true value of NRD stock in mid-April, unaffected by the alleged omis-

sions, was $6. If the Keystone announcement caused the stock to spike to over $15 per share during the week preceding the April 21 press release, there is no rational explanation how the stock's true value could have been only $6 several days later. The indisputable data on NRD's stock price for the three months prior to April 1981, when it was trading from $9 to $13 per share, also cannot be squared with Hammerslough's theory or his conclusion as to the true value of the stock unaffected by the alleged omissions. Tr. 4/25/96 at 453–4. Hammerslough began his analysis as of April 21, but did not take into account the movement or level of NRD's stock price before that date. Tr. 4/24/96 at 319, 364–65.

Plaintiff's answer to these arguments is that they were all presented by defendants at trial, and were evidently rejected by the jury. On that basis, plaintiff contends that these arguments presented, at most, a credibility issue for the jury: whether to believe Hammerslough or defendants' contrary evidence? If that were so, then defendants would clearly not be entitled to relief under Rule 50.

The flaw in plaintiff's argument is that theories must be proved, not merely stated, and in any event, are only as good as their ability to explain and account for objectively observable phenomena. The deficiency in this case is that Hammerslough, by his own admission, contradicted the fundamental factual premise on which plaintiff relied to invoke the "sell on the news" theory as an explanation for NRD's stock price movement. Establishing the basis to apply that theory to the facts of this case was essential if plaintiff was to show loss causation and damages on his contention that the April press release inflated NRD's stock price over its "true" value of $6, in the face of the observable reality that NRD's stock price went down, not up, following that announcement. Similarly, there was no rational way to reconcile Hammerslough's conclusion that the real value of NRD's stock, unaffected by the allegedly omitted information, was $6 per share immediately prior to the April 21 press release, with the observable reality that the stock had been trading far above $6 per share since January 1981 through and including April 21, 1981, and had reached $15 per share only days before the April 21 press release on the strength of the Keystone announcement.

In short, the problem here was not in the "sell on the news" theory as an abstract proposition; it was in plaintiff's failure of proof, and the inability of plaintiff's theory to account for critical, and indisputable, historical facts. Plaintiff's argument fails because Hammerslough never looked at the important data, such as NRD's stock trading history prior to mid April, and then abandoned the factual predicates for his own "sell on the news" theory when he conceded that the Keystone announcement on April 9 was the far more likely explanation for the rise in NRD's stock immediately prior to the Madawaska press release.

The closest Hammerslough came to an explanation that might make sense of the historical data was his assertion that the April 21 announcement may have "maintained" price inflation in the stock caused by some other event. Tr. 4/24/96 at 353. If plaintiff had established the factual predicates to invoke this theory as its showing of loss causation and damages, the omissions in the April 21 press release might have been relied upon to show a slowing of the decline in NRD's stock that Hammerslough himself acknowledged was occurring between April 21 and July. Tr. 4/24/96 at 355.

But plaintiff never pursued this theory of loss causation or damages at trial, and it remained only a passing remark by Hammerslough. There is nothing in the record evaluating the degree of impact, if any, of the April press release on NRD's stock price decline, or suggesting how quickly the stock would have declined but for the April 21 press release. Certainly, damages on a "slowing of the decline" theory could not possibly have been measured using the technique actually applied by Hammerslough on the inconsistent "sell on the news" theory of loss causation and damages actually relied upon by plaintiff at trial. Without a completely different approach to damages, and some reasonable basis in the evidence for the jury to accept it, it would have been impossible to conclude whether plaintiff or the class

suffered any loss as a result of omissions in the April 21 press release, or if they did, in what amount that loss might have been. Since plaintiff never pursued any such theory at trial, it was waived.

If Hammerslough had offered the jury any rational explanation of the evidence and the historical facts that was consistent with his conclusions, I would summarily reject this ground for defendants' Rule 50 motion. Plaintiff's problem is that Hammerslough did no such thing, and I can see no rational way to reconcile his conclusions with the historical and indisputable facts. Those facts clearly and convincingly sever any link between the alleged omissions and the damages in terms of the price inflation plaintiff claimed at trial. *Basic Inc. v. Levinson,* 485 U.S. 224, 249, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). For these reasons, I am compelled to grant defendants' Rule 50 motion on this ground as well.

### C. The materiality of the alleged omissions

The third ground for defendants' motion asserts that the alleged omissions on which plaintiff relied were not material as a matter of law. Materiality is normally an issue for the jury, since it turns on what a "reasonable person would consider important in deciding to buy or sell shares." *Azrielli v. Cohen Law Offices,* 21 F.3d 512, 518 (2d Cir.1994). This is a much closer issue than the first two grounds for defendant's motion.

Plaintiff's claim that defendants violated Section 10(b) by omitting to disclose a "conflict of interest" on the part of Professor Schaffel, which supposedly gave Professor Schaffel a motive to inflate his estimate of the quartz reserve in his 1980 report, is very weak. At the time that Professor Schaffel made that report, he had never heard of NRD and had no consulting or other arrangements with it. Professor Schaffel's interest in distributing high purity quartz through a Brazilian company with which he was affiliated in some capacity, Tr. 4/23/96 at 69–70, and the possibility that he might earn commissions doing so in the future if the Madawaska mine were commercially developed, is highly speculative and far removed from the type of clear and direct bias that

might warrant specific mention in a public company's press release in other circumstances.

A reasonable investor would understand, without any specific disclosure, that consultants and other professionals rendering professional services, such as Professor Schaffel did here, expect to be paid for their work. A reasonable investor would also understand, without any specific disclosure, that professionals are interested in continuing to be retained by their clients to render their professional services in the future, and that such future services if rendered will generate earnings for those professionals.

As far as I can determine, no court has ever held that a public company violates Section 10(b) if it issues a press release referencing some report or conclusion reached by the company's accountants, attorneys or other professional consultants, without also making an express disclosure of the company's fee arrangement with that professional in the same press release. Nor am I aware of any case where a public company has been found to have violated Section 10(b) by failing to disclose in a press release referencing such a consultant's report or conclusions, any indirect financial interest that might have colored the consultant's objectivity. Yet that is the kind of "conflict of interest" plaintiff claims defendants were obligated to disclose here.

Similarly, the omissions about the so-called 500 ton estimate noted in passing in Professor Schaffel's report, and the estimate from a 1947 report of 19,080 tons of "clean quartz" reserve, seem unlikely to have been of significance to a reasonable investor. There is nothing to show that either Becker–Fluegel or Bronson were even aware of the 19,080 estimate at the time of the April press release or the distribution of the NRD annual report. Professor Schaffel testified that he had never heard of that estimate. Tr. 4/23/96 at 86–7. Mr. Macisaac testified that he prepared the history section of the ACA Howe report where the 19,080 estimate is referenced. He testified he "felt the history was incorrect in some respects, [and] I guess correct in other respects." Tr. 4/24/96 at

273. He was not asked into which category he felt that 1947 estimate fell.

Macisaac testified that "most of the information [in the history section of his report] came from Government [of] Ontario files in their mineral resources section ... here in Toronto." Tr. 4/24/96 at 272. He was not asked specifically where he obtained the 1947 report containing the 19,080 ton estimate. Macisaac testified that the information he obtained from governmental files in Toronto was available to anybody "if they knew where to look." Tr. 4/24/96 at 272. Macisaac stated that, during the relevant times in 1981, he "had no connection with NRD ... [or] Wigley," and "would not give reports to Becker–Fluegel." Tr. 4/24/96 at 270.

Whether on this record Becker–Fluegel or Bronson can be charged with knowledge of the 1947 report, and thus a duty to disclose the 19,080 ton estimate assuming it was material, seems highly questionable.

The record is barren of any evidence regarding the date, source or basis for the 500 ton estimate. Professor Schaffel testified that, as best he could remember, this was something mentioned in passing to him by the president of Comet Quartz. Tr. 4/23/96 at 81–3, 119. Professor Schaffel deemed both the 500 ton estimate and the 19,080 estimate "ridiculous" and "nonsense" because, inter alia, some 20,000 tons of quartz had been mined from the Madawaska deposit in 1980 alone. Tr. 4/23/96 at 82–4.

Any disclosure about those two estimates in the April press release (putting aside the issue whether Becker–Fluegel or Bronson even knew of the 19,080 ton estimate at the time), presumably would have required disclosure of the reasons why Professor Schaffel deemed them "ridiculous." Surely, disclosing a 500 ton estimate of unknown date would not be of significance to a reasonable investor if the press release also disclosed, as Professor Schaffel testified without contradiction, that 20,000 tons of quartz had been mined from the Madawaska site in 1980 alone. An estimate of only 19,080 tons dating from 1947 would also be of questionable importance to a reasonable investor for the same reason.

On the other hand, the omission of the "drilling" qualification, noted in Professor's Schaffel's report and included in an early draft of the April press release, is not nearly so close. Indeed, even defendant Bronson admitted that he regarded that qualification as important information which belonged in the press release. Tr. 4/23/96 at 148.

Yet even on this point, the April press release stated clearly that NRD's option was subject to an escrow arrangement until July 31, 1981 "to give [NRD] time to further investigate and evaluate the property prior to finalizing the agreement. Finalization also depends on approval of regulatory bodies" (Ex. P–3). Plaintiff testified that he understood that an "option" meant NRD had the "ability to walk away" from the deal, and that the reference to further "investig[ation] and evaluat[ion]" meant that this transaction was far from a "done deal." Tr. 4/23/96 at 47–8.

Whether plaintiff's proof of materiality was so insubstantial as to fall below the minimum necessary for a reasonable juror to find in favor of plaintiff is a difficult issue, particularly with respect to the omission of the "drilling" qualification to Professor Schaffel's conclusions. Whether that omission alone would be sufficient to support the jury's finding of liability and damages is even more difficult. Because the first two grounds for defendants' motion are sufficient to warrant the granting of the relief defendants seek under Rule 50, I do not reach the merits of their claim that the alleged omissions were not material as a matter of law.

## II. THE NEW TRIAL MOTION PURSUANT TO RULE 59

■ A motion for a new trial pursuant to Rule 59 should not be granted unless the jury has reached "a seriously erroneous result" or the "verdict is a miscarriage of justice ... i.e., that the verdict is against the weight of the evidence, that the damages awarded were excessive, or for stated reasons the trial was not fair to the moving party." *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 691 (2d Cir.1983); *Bevevino v. Saydjari*, 574 F.2d 676, 684 (2d Cir.1978). In other decisions, the Second Circuit has phrased the test slightly differently, while

noting that its substance is the same. *Dunlap–McCuller v. Riese Organization,* 980 F.2d 153, 158 (2d Cir.1992), *cert. denied,* 510 U.S. 908, 114 S.Ct. 290, 126 L.Ed.2d 239 (1993).

Rule 50(c)(1) provides that "[i]f the renewed motion for judgment as a matter of law is granted, the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed, and shall specify the grounds for granting or denying the motion for the new trial." That rule applies here, since I have granted defendants' renewed motion under Rule 50.

If the Court of Appeals concludes that I erred in granting defendants' Rule 50 motion, I would not be able to conclude that the jury's verdict was "seriously erroneous" or resulted in a "miscarriage of justice." A vacatur or reversal on appeal would necessarily require the Court of Appeals to conclude that on this record defendants may be found liable as primary violators under Section 10(b) as construed in *Central Bank,* and that I erred in holding that plaintiff had failed to offer sufficient proof upon which a reasonable jury could conclude that plaintiff had met its burden of proving loss causation and damages. The jury instructions in this case reflected the uncertainty at that time as to the proper test for applying *Central Bank,* and combined aspects of both the "substantial participation" and "bright line" tests discussed above. A reversal of my holding that *Central Bank* requires the dismissal of this case will necessarily mean that those instructions correctly stated the law, even though for the same reasons that I have granted defendants' Rule 50 motion, it appears that the instructions were more favorable to plaintiff than *Wright* and *Shapiro* permit. If the Court of Appeals rejects my analysis on the Rule 50 motion on that point, that Court's reasoning will almost certainly undercut any argument for a new trial on the same grounds.

If the grounds for granting defendants' Rule 50 motion are rejected on appeal, I see no other basis for concluding that the jury's verdict was so clearly erroneous as to warrant another trial in this already 18–year old case. In the event that the Court of Appeals reverses the judgment to be entered pursuant to Rule 50, the concerns expressed above about plaintiff's proof of the materiality of the omitted facts, standing alone, would not warrant a new trial, given the strong presumption in favor of jury resolution of that issue.

## CONCLUSION

For the foregoing reasons, defendants' motion for an order pursuant to Rule 50(b) directing the entry of judgment in their favor dismissing the complaint is GRANTED; and defendants' motion for a new trial is conditionally DENIED pursuant to Rules 50(c)(1) and 59, in the event that the judgment to be entered pursuant to this decision is subsequently vacated or reversed on appeal.

The Clerk is directed to enter judgment in favor of defendants Herman Becker–Fluegel and Howard Bronson & Company, and against plaintiff, dismissing the complaint against them. No costs.

**SO ORDERED.**